**E-FILED**
Friday, 18 August, 2006  11:07:12 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

|  |  |  |
|---|---|---|
| **DEBRA J. RUNNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 05-2108** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY, sued as Jo Anne B. Barnhart,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# REPORT AND RECOMMENDATION

In August 2003, an Administrative Law Judge (hereinafter "ALJ") denied disability insurance benefits (hereinafter "DIB") and supplemental security income payments (hereinafter "SSI") to Plaintiff, Debra Runner, under Title II of the Social Security Act (42 U.S.C. §§ 416(I), 423).  The ALJ found that, although Plaintiff had not engaged in substantial gainful activity since 2000 and had a combination of impairments of qualifying severity, these medically determinable impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpt. P, App. 1, Reg. 4.  In addition, the ALJ found that Plaintiff could perform a significant number of jobs available in the economy.

In September 2003, Plaintiff filed a Request for Review with the Appeals Council. (R. 13-15.)  In May 2004, the Appeals Council denied Plaintiff's request for review.  (R. 5.)  In December 2004, Plaintiff's counsel submitted comments in support of Plaintiff's claim.  (R. 272-75.)  In March 2005, the Appeals Council again denied Plaintiff's request for review.  (R. 5-7.) In May 2005, Plaintiff filed a Complaint for Judicial Review (#1) in this Court against Defendant, Jo Anne Barnhart, the Commissioner of Social Security, seeking judicial review of the Social Security Administration's final decision.  In November 2005, Plaintiff filed a Motion for Summary Judgment (#7) and in March 2006, Defendant filed a Motion for an Order which Affirms the Commissioner's Decision (#10).  After reviewing the administrative record and the

parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment (**#7**) be **GRANTED** and that Defendant's Motion for an Order which Affirms the Commissioner's Decision (**#10**) be **DENIED**.

## I.  Background
### A.  Procedural Background

Plaintiff first applied for SSI and DIB in October 2000 based on discogenic and degenerative back disorders, as well as mood disorders.  (R. 257-60, 59-61.)  The Social Security Administration (hereinafter "SSA") denied Plaintiff's application for benefits in May 2001. (R. 262-65.)  Later that month, Plaintiff filed a request for reconsideration, which the SSA rejected in August 2001.  (R. 267.)  Plaintiff filed a request for a hearing by an ALJ in October 2001.  (R. 42.)  In August 2003, ALJ Gerard Rickert held a hearing in which Plaintiff and a vocational expert appeared and testified.  (R. 19.)

In his August 2003 decision, the ALJ found that Plaintiff was not entitled to either SSI or DIB.  (R. 27.)  The ALJ came to this decision because:  (1) despite having been diagnosed with degenerative disc disease of the spine, headaches, and adjustment disorder with depressed mood, Plaintiff's conditions did not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpt. P, App. 1, Reg. 4; (2) Plaintiff's testimony concerning her impairments' effect on her ability to work, while generally credible, was not credible to the extent alleged by Plaintiff; and (3) Plaintiff had the residual functional capacity to perform light work subject to a number of nonexertional limitations including a prohibition from climbing ladders, ropes, or scaffolds; no more than occasional stooping, crouching, or reaching; no employment requiring exposure to temperature extremes; and employment that requires no more than simple, repetitive tasks. (R. 26-27.)  The ALJ concluded that Plaintiff retained the ability to perform a wide range of jobs available in the national economy and therefore she was not eligible for either SSI or DIB.

**B.  Medical Background**

The following background is taken from the record.  In September 1997, Plaintiff's treating physician, Dr. Gaylin Lack, diagnosed Plaintiff with mild carpal tunnel syndrome. (R. 238.)  By January 1998, Plaintiff had resumed regular activities.  (R. 241.)

In September 1999, Plaintiff was injured in a car crash.  (R. 150.)  After the crash, Plaintiff initially thought she was not injured and tried to work, but she experienced pain in her back and neck.  (R. 150.)  She first sought treatment from a chiropractor, but that treatment aggravated her condition.  (R. 150.)

Plaintiff met with Dr. Lack concerning the crash injuries in October 1999.  (R. 150.)  She complained of pain in the interscapular area, mid-back, and at the base of the neck, with occipital headaches and neck pain and stiffness.  (R. 150.)  Dr. Lack's examination showed significant restriction of motion in her neck with very poor dorsal glide and poor rotation in both directions. (R. 150.)  He diagnosed probable cervical strain, recommended that Plaintiff restrict her work and continue physical therapy, and prescribed Vioxx.  (R. 150.)

Plaintiff returned to Dr. Lack three weeks later for a follow-up examination, complaining that she had intermittently severe symptoms.  (R. 149.)  Dr. Lack found slightly positive foraminal sign and tenderness in the right occipital area.  (R. 149.)  He noted that Plaintiff's physical therapist believed that Plaintiff could not return to work and had recommended continued therapy.  (R. 149.)  Dr. Lack agreed with the work restriction and scheduled Plaintiff for an MRI of the cervical spine.

In November 1999, Dr. Lack noted that Plaintiff's MRI revealed degenerative disc changes at C 2/3 and C 6/7 including minimal cervical spondylosis at C 2/3 and C 6/7 and a concurrent strain or sprain.  (R. 232, 148.)  Additionally, the MRI showed a straightening of the cervical spine with loss of normal cervical lordosis.  (R. 232.)  Dr. Lack's examination showed continued limitation in motion of her neck, and tenderness in the interscapular area.  Dr. Lack

3

continued to prescribe Vioxx, discontinued her physical therapy, prescribed a home exercise program, and continued the work restriction.  (R. 148.)

Examinations in December 1999 and January 2000 showed that Plaintiff was making significant improvements, and Dr. Lack cleared Plaintiff to go back to work in January 2000. (R. 146-47.)  However, Plaintiff sought medical attention from Dr. Lack in February 2000 due to a "sudden onset of severe neck pain, radiation down into the left upper extremity."  (R. 145.) Dr. Lack's subsequent examination revealed spasm in the left trapezius, restriction of rotation to the left, tightness and restriction of lateral bend to the right, and slightly positive foraminal sign to the left.  Dr. Lack diagnosed radiculopathy and recommended another MRI and work restrictions.  (R. 145.)  After two weeks, Plaintiff continued to complain of pain on the left side of her neck and left shoulder.  (R. 144.)

In March 2000, Dr. Lack reported that Plaintiff's MRI continued to show minimal cervical spondylosis at C 2/3 and C 6/7, a concurrent strain or sprain, and straightening of the cervical spine with loss of normal cervical lordosis.  (R. 230, 143.)  He noted that Plaintiff's condition had improved and cleared her for light duty work.  (R. 143.)

In May 2000, at a consultation with Dr. Lack, Plaintiff complained of heaviness and a "dead weight" feeling in her arms, particularly in the early morning, and some neck stiffness and pain in the posterior left thoracic region.  (R. 141.)  An examination showed a diminished range of motion in her neck with some limitation in the dorsal glide and in rotation, particularly to the left. (R. 241.)  Dr. Lack diagnosed cervical strain, with some impressions of radiculopathy.  He recommended nerve conduction studies, prescribed Celebrex, and restricted Plaintiff to light duty work.

In May 2000, Dr. Lack reported that nerve conduction studies were unremarkable, but he did not rule out the possibility of some nerve root irritation.  Plaintiff continued to complain of neck and shoulder problems and bilateral arm symptoms, including a dead feeling in her arms

and pain and stiffness in her neck with some tingling into the left fifth finger.  Dr. Lack
continued to limit Plaintiff to light duty work and continued to prescribe Celebrex.  (R. 140.)

In June 2000, Plaintiff complained of a recent increase in symptoms in her neck,
shoulder, and left arm.  (R. 138.)  She reported that her pain was severe, and was apparently
aggravated by working a repetitive job involving significant amounts of pulling.  (R. 139.)
Dr. Lack's examination showed some limitation of rotation to the left, as well as a slightly
positive foraminal sign to the left.  Dr. Lack diagnosed exacerbation of cervical strain and
recommended symptomatic treatment, physical therapy, and a temporary work restriction.
(R. 138.)

In July 2000, Dr. Lack advised Plaintiff to consult a neurosurgeon or neck specialist.
(R. 135.)  Dr. Walker Robinson, a neurologist, examined Plaintiff in August 2000.  Dr. Robinson
noted that Plaintiff "had limitation of motion of the neck in all directions," and that "far lateral
turning and bending all caused severe pain" in her neck.  (R. 169.)  Plaintiff was unable to flex
and extend her neck without severe pain and felt tenderness in the supraclavicular fossae
bilaterally, right greater than left.  (R. 169.)  Plaintiff complained of pain across the top of her
shoulders and throughout the shoulder girdle bilaterally, and reported numbness and tingling in
her extremities and a sensation of cold in her right hand.  (R. 169.)  Despite these symptoms,
Dr. Robinson did not assess a need for neurosurgery at that time.  (R. 169.)

In October 2000, Plaintiff complained of neck pain and stiffness, pain on the right side of
her head along the temporal area and down into her neck, an inability to tolerate cold, and pain in
the interscapular area and down the lower back.  (R. 133.)  Dr. Lack diagnosed chronic cervical
sprain superimposed upon very mild spondylitic change in the neck and recommended pain
management and pain medication.

In November 2000, Plaintiff exhibited severe symptoms on the right side of her body for
the first time.  (R. 132.)  She also complained of headaches in the suboccipital area, pain and
stiffness at the neck shoulder angle bilaterally, pain in the shoulders, increased symptoms with

5

weather changes, and popping and grinding in the neck.  Dr. Lack observed restricted range of motion in the neck, slightly positive foraminal enclosure sign to both directions, pain radiating into the neck shoulder area and down into the top of the shoulder, and a somewhat limited dorsal glide.  He diagnosed cervical strain or sprain with chronic neck symptoms and recommended pain medication and a muscle relaxant.  (R. 132.)

In February 2001, Plaintiff complained of symptoms on her entire left side, including neck pain and stiffness, headaches, pain at the neck shoulder angle, and some left arm symptoms, as well as low back pain and some numbness in the right thumb.  (R. 131.)  Dr. Lack continued Plaintiff on pain medication and a muscle relaxant, and also prescribed Mobic, a drug indicated for the relief of osteoarthritis symptoms.  (R. 131.)

In February 2001, x-rays of the cervical spine indicated mild C 3/4 and C 6/7 disc degeneration and increased cervical lordosis perhaps related to muscle spasm.  (R. 152.)  A third MRI of the cervical spine revealed severe damage to the neck, showing features of a C 6/7 left paracentral disc protrusion with possible slight craniad migration of a disc fragment and degenerative bony spurring associated with borderline central canal stenosis.  (R. 153.)

In February 2001, Dr. Hima Atluri examined Plaintiff at the behest of the SSA.  (R. 172-75.)  Dr. Atluri diagnosed Plaintiff as having a cervical neck and back sprain, as well as a history of anxiety and depression.  (R. 172.)  She reported that Plaintiff has occasional headaches, dizziness, and lightheadedness, and that her medications make her "sick to her stomach and nauseated."  (R. 173.)  Dr. Atluri observed that Plaintiff had no limitation of motion in any joint in the upper or lower extremities, her grip strength was strong and equal bilaterally, and her back flexion, extension, and lateral flexion were normal.  (R. 174.)  The report also stated that Plaintiff had no difficulty in getting on or off the exam table, or with tandem walking, walking on heels or toes, squatting, rising, or hopping on one leg, and that she had no need for an assistive device.  (R. 174.)  Finally, Dr. Atluri's report stated that Plaintiff was "unable to walk ½ block distance," and that Plaintiff "tried to walk up and down the steps but it is very hard."  (R. 172.)

6

In March 2001, Dr. Lack recommended that Plaintiff see a neurosurgeon regarding the possibility of neck surgery.  (R. 130.)  The neurologist conducted a myelogram and nerve conduction studies, but according to Dr. Lack, the neurologist opined that surgical intervention was not warranted.  (R. 129, 208.)

Dr. Jerry Boyd, a licensed clinical psychologist, examined Plaintiff in April 2001 at the request of the SSA.  (R. 184-88.)  Dr. Boyd listed Plaintiff's chief complaint as being "[p]ain 95% of the time," and "[d]epressed quite a bit."  (R. 184.)  Dr. Boyd described Plaintiff as being alert, correctly oriented, and of low average intelligence.  (R. 186.)  Dr. Boyd reported that she exhibited some inconsistency in attention, concentration, and short-term memory, but he judged Plaintiff as being able to follow "moderately complex instructions and . . . able to be consistent and use reasonable judgment."  (R. 186, 187.)  Finally, Dr. Boyd opined that Plaintiff "would likely have difficulty with work pace due to her chronic pain and in particular during periods of exacerbation."  (R. 187.)

Plaintiff saw Dr. Lack for examinations in July and August of 2001, and her condition remained relatively unchanged.  (R. 128, 224.)  During the latter visit, Dr. Lack suggested another examination by the neurologist.  (R. 224.)

In January 2002, Dr. Lack noted that Plaintiff had seen the neurologist in September 2001, and that the neurologist had told Plaintiff that surgery may provide relief from Plaintiff's arm pain, but would most likely not relieve her neck problems or headaches.  (R. 223.)  Dr. Lack also reported that Plaintiff complained more of neck pain, headaches, and tightness of chest. (R. 223.)  Dr. Lack noted that symptoms were aggravated by working at a desk or table with the neck flexed, driving, or even by every day activity such as using a curling iron.  (R. 223.)

In May 2002, Dr. Lack filled out a questionnaire at the behest of Plaintiff's attorney. (R. 212.)  This report opined that Plaintiff had chronic cervical strain or sprain, cervical spondylosis, and a herniated disc at C 6/7 left-sided, with the primary symptoms of neck pain,

headaches, neck stiffness, pain radiating to the right upper extremity, numbness and tingling in the right hand, lightheadedness, and chest wall discomfort.  (R. 213, 214.)  The report further estimated Plaintiff's level of pain as seven to eight on a ten point scale, rated as moderately severe, and estimated Plaintiff's level of fatigue as four to six on a ten point scale, rated as moderate.  (R. 214.)  Dr. Lack assessed Plaintiff's pain, fatigue, and other symptoms as severe enough to frequently interfere with attention and concentration.  (R. 217.)  Dr. Lack indicated that Plaintiff's symptoms would likely increase if she were placed in a competitive work environment, and that such symptoms would frequently interfere with attention and concentration.  (R. 216, 217.)  He opined that, in a full-time work situation, Plaintiff could only sit three to four hours, stand or walk one to two hours, and would have to be able to get up and move around for five to ten minutes at least once per hour.  (R. 215.)  Dr. Lack reported that Plaintiff would likely have to take unscheduled breaks, approximately three to four times a day for ten to thirty minutes each.  (R. 217.)  Dr. Lack also indicated that Plaintiff could lift or carry a maximum of ten pounds occasionally.  (R. 215.)  Plaintiff's ability to grasp, turn, or twist objects was moderately limited with her left hand and minimally limited with her right hand, her ability to perform fine manipulation with her left hand was minimally limited, and she was essentially precluded from using either arm for reaching.  (R. 215-16.)  The report also recommended that Plaintiff engage in no pushing or pulling.  (R. 217.)  Dr. Lack ultimately opined that Plaintiff's prognosis was "very poor" in terms of "substantial improvement and return to a functional status and gainful employment."  (R. 213.)

At a follow-up examination in September 2002,  Dr. Lack noted that Plaintiff continued to have a very poor dorsal glide, limited rotation to the left, and limited motion in her back with decreased extension to fifteen degrees, and flexion limited to twenty-five degrees.  (R. 222.) Dr. Lack scheduled Plaintiff for an MRI of her cervical spine.  (R. 222.)

Plaintiff saw Dr. Lack in October 2002, after her September MRI.  (R. 219.)  The MRI showed no new changes at C 6/7, a small left paracentral disc protrusion, and osteophyte complex.  (R. 219.)  Dr. Lack assessed this as being consistent with the fact that Plaintiff has had

ongoing symptoms for two or more years.  (R. 219.)  However, he again dismissed the idea of surgery and continued to recommend observation and conservative management.  (R. 219.)

In May 2003, Dr. Lack reiterated his conclusions about Plaintiff's September 2002 MRI, and noted continuing pain in the neck and shoulders radiating into her left upper extremity, as well as in her lower back, right hip, and leg.  (R. 244.)  The report assessed Plaintiff's prognosis as "guarded," noting that Plaintiff is "significantly limited in her everyday activities," and "capable of no more than sedentary activity and very light activity and must do this very sparingly with frequent rest."  (R. 244.)  Finally, Dr. Lack noted that "[a]ny increased activity aggravates [Plaintiff's] symptoms."  (R. 244.)

Rita Shirley, outpatient therapist, examined Plaintiff over a two-week period in June 2003.  (R. 247-55.)  Ms. Shirley diagnosed Plaintiff as being depressed based on clinical findings of mood disturbance, feelings of guilt and worthlessness, decreased energy, and a desire not to wake up from sleep.  (R. 249.)  Moreover, Ms. Shirley found that Plaintiff's "depression may interact with pain to worsen it."  (R. 254.)  Ms. Shirley's report indicated that Plaintiff's depression would markedly limit her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; markedly limit her ability to complete a normal work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderately limit her ability to travel to unfamiliar places or use public transportation.  (R. 251-53.)  Ms. Shirley also opined that Plaintiff would likely be absent from work more than three times a month as a result of her conditions.  (R. 255.)

## C.  Testimony at the Hearing

At the time of the hearing, Plaintiff was thirty-eight years old.  (R. 281.)  She is 5'5" tall and weighed 175 pounds at the time of the hearing.  (R. 281.)  She resided with her boyfriend in a two-story house she owned.  (R. 281, 282.)  Plaintiff completed the eleventh grade of school.  (R. 282.)  She can read, write, and do basic math.  (R. 282-83.)  She reads "a little," generally

magazines and the newspaper.  (R. 291.)  She drives about once a week, generally to go to the store or to visit her sister, who lives nearby.  (R. 290.)  Plaintiff does not have a home computer.  (R. 290.)  Friends visit her two to three times a week to "sit around and just talk."  (R. 290, 298.)  She belongs to no clubs or social organizations, does not go to church, and does not engage in sports or outdoor activities.  (R. 291.)  She does not smoke, drink, or take street drugs.  (R. 291.)

Plaintiff most recently worked as a bindery worker.  (R. 283.)  The last time she worked full-time in this capacity was September 1999, before the accident that injured her back.  (R. 283.)  After the accident, she attempted to return to the job from time to time during the first part of 2000.  (R. 284.)  During 2000, she earned over $7,000 from that job.  (R. 284.)  Prior to her job at the bindery, Plaintiff worked at a variety of jobs.  From 1994 until 1996, she worked as a cook in a restaurant.  (R. 283.)  From 1992 until 1994, she worked as a cook in a nursing home.  (R. 283.)  From 1989 until 1992, she worked as a stringer in a factory.  (R. 283.)  From 1983 until 1989, she worked as a kitchen aide in a nursing home.  (R. 283.)

Plaintiff testified that she experiences a great deal of pain in her neck, shoulder blades, and lower back.  (R. 286.)  She attributes these physical symptoms to the September 1999 automobile accident.  (R. 285, 286.)  She also feels pain in both arms and legs, with more intense pain in her arms and her right extremities.  (R. 287.)  Although certain weather conditions exacerbate the pain, she feels this pain every day, all day.  (R. 287.)  Her left arm sometimes feels numb.  (R. 292.)  She also experiences what she refers to as migraine headaches, although Dr. Lack has not diagnosed her with migraines.  (R. 284, 288.)  Plaintiff's counsel indicated that the headaches that Plaintiff refers to as "migraine headaches" are probably a symptom of Plaintiff's neck problems.  (R. 288.)

Plantiff testified that she is using a variety of measures to treat the pain.  She takes a number of medications, including the prescription medicines Vioxx, Skelaxin, generic Darvon, and Celebrex.  (R. 285.)  She also takes over-the-counter arthritis Tylenol and aspirin when she cannot afford other medications.  (R. 285-86.)  The pain medications decrease her subjective

feelings of pain from a normal level of an eight on a scale of ten, with ten being the most intense pain, to a level of five.  (R. 296.)  This reduction in pain is effective for about half an hour to an hour.  (R. 297.)  The pain medication makes Plaintiff drowsy and slow and makes her want to sleep during the day, which she does four to five times during a week.  (R. 297.)  Plaintiff has had physical therapy in an attempt to reduce pain symptoms, but she discontinued it in 2000 because she felt it made things worse.  (R. 286.)  She also applies a heating pad to her neck and lower back on a daily basis for at least three or four hours during the afternoons, in the evenings from five until she goes to bed, and at times for the entire night.  (R. 287, 295, 297-98.)

Plaintiff testified that her injuries and symptoms result in difficulty lifting and carrying, and exertion such as carrying a gallon of milk exacerbates Plaintiff's symptoms, causing pain down her arms and in her chest.  (R. 292.)  She cannot stand for more than fifteen or twenty minutes; doing so causes both her neck and lower back to shake and feel weak.  (R. 292-93.)  Plaintiff has difficulty walking for more than one city block.  (R. 293.)  She is unable to squat or stoop down and stand back up; doing so makes it feel as if  "[Plaintiff's] back's going to go out."  (R. 296.)  Plaintiff  has difficulty reaching out in front of her and above her head, which sometimes causes pain in her neck.  (R. 293-94.)  Grasping and gripping with her right hand also causes Plaintiff problems; she testified that she often drops objects she tries to grip.  (R. 294.)  She cannot easily move her head from side to side and up or down.  (R. 295.)  She can only look down for five to ten minutes before her neck hurts.  (R. 295.)

Plaintiff testified that the pain she experiences significantly interferes with her daily activities.  She needs help doing laundry and washing dishes.  (R. 287-88, 289.)  She also needs help cooking, which she limits to quick meals in order to minimize the amount of time she must stand.  (R. 288, 289.)  She does not sweep, vacuum, or do yard work.  (R. 288, 289.)  She is limited in her ability to crochet, which she testified is her only hobby; crocheting causes her arms to tire and puts strain on her neck.  (R. 290, 295.)  Plaintiff feels pain when bending down, for example when she pulls up her socks.  (R. 295-96.)  While Plaintiff generally is able to bathe and dress herself, she has some problems with personal hygiene.  (R. 291, 295.)  She has had her

11

boyfriend wash her hair "a time or two," due to the fact that lifting her arm makes her sore. (R. 296.)

Regarding mental health issues, Plaintiff testified that she feels depressed three or four times a month. (R. 299.) When she feels depressed, she "just want[s] to lay around and cry or just kind of be by [her]self." (R. 299.) The pain she feels also interferes with her ability to pay attention and focus. (R. 299.) When asked for an example of this, Plaintiff testified that at times she will "go into a room and think about getting something . . . and . . . just all of a sudden . . . think what'd I come in here for [(*sic*)]." (R. 299-300.)

At the hearing, vocational expert Dennis Gustefson (hereinafter "VE") testified. The VE first testified that an individual of Plaintiff's age and educational level would be unable to do her past work when subject to limitations of lifting no more than ten pounds frequently and twenty pounds occasionally; no climbing ladders, scaffolds, or ropes; only occasional stooping, crouching, or reaching away from the body; no temperature extremes; and only performing simple, repetitive tasks due to difficulties with attention and concentration. (R. 301-02.) The VE next testified that there were over 9,000 light work jobs in the state that a person subject to those limitations could perform. (R. 302.)

Plaintiff's counsel then cross-examined the VE, posing a hypothetical limiting an individual with the same nonexertional limitations to sedentary work. (R. 303.) The VE responded that he would "pretty much rule out" sedentary work for a person with those limitations, especially due to the limitation of reaching away from the body. (R. 303.) Plaintiff's counsel next asked if an individual with the limitations Plaintiff described regarding moving her head would be further limited in her work options. (R. 303.) The VE answered that this would not significantly affect the number of jobs available to such a person. (R. 304.) Plaintiff's counsel next asked if the light jobs testified to by the VE had a sit/stand option, to which the VE replied that they generally did not, and that if an individual required a sit/stand option, that would reduce the number of jobs available by roughly 80%. (R. 304-05.) Finally,

12

Plaintiff's counsel asked the VE about the number of jobs available to an individual with additional limitations that were recommended by Plaintiff's treating physician, including working less than an eight-hour day, sitting for four hours a day, being on her feet no more than two hours a day, and lifting five to ten pounds occasionally.  (R. 305.)  The VE testified that such conditions would prevent full-time employment.  (R. 305.)

### D.  The ALJ's Decision

In determining whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a)-(f).  The Commissioner must determine in sequence:  (1) whether the claimant is currently employed (or was during the relevant period); (2) whether she had a severe impairment; (3) whether the impairment met or equaled one listed in the Regulations; (4) whether the claimant could have performed her past work; and (5) whether the claimant was capable of performing any work in the national economy.  *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).  Once the claimant has satisfied the first two steps, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment, but cannot perform his past work, the burden shifts to the Commissioner to show that the claimant can perform some other job.  *Pope v. Shalala*, 998 F.2d 473, 477-78 (7th Cir. 1993).

In this case, the ALJ determined that Plaintiff was not engaged in substantial gainful activity at the time of the hearing and thus satisfied the first step of the analysis.  At the second step, the ALJ determined that Plaintiff has a number of impairments that are considered severe within the meaning of the Social Security Act, including degenerative joint disease of the spine, headaches, and an adjustment disorder with depressed mood.  (R. 21.)  However, Plaintiff failed to satisfy step three of the test because her combination of impairments does not meet or equal the level of severity of an impairment specified in the Listing of Impairments in 20 C.F.R. § 404, Subpt. P, App. 1, Reg. 4.  (R. 24.)  Specifically, the ALJ stated that "the limitations of function resulting from the claimant's mental condition fall far short of the severity contemplated in the Listings."  (R. 24.)  The ALJ also found Plaintiff's musculoskeletal condition insufficient to

13

qualify as a listed impairment, finding it particularly significant that Dr. Lack, in a 2003 letter, expressed the opinion that "the claimant is capable of sedentary to very light activity." (R. 24.)

At step four, the ALJ decided that Plaintiff cannot be expected to perform any of her past relevant work. (R. 25.) However, the ALJ decided that Plaintiff has the residual functional capacity (hereinafter "RFC") to do light work, subject to a number of nonexertional limitations. (R. 24.) At step five, the ALJ decided that the claimant had the RFC to perform a wide range of light work, thus Plaintiff was not disabled according to the Social Security Act and she was not eligible for disability benefits. (R. 27.)

## II.  Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether a plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits. *Brooks v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

The Court gives considerable deference to the ALJ's credibility determinations and will not overturn them unless a plaintiff can show that those findings are patently wrong. *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992); *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989). However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

14

### III.  Analysis

Plaintiff argues that substantial evidence does not support the ALJ's decision for the following reasons:  (1) the ALJ erroneously rejected the opinion of Rita Shirley, a treating psychological therapist; (2) the ALJ erroneously rejected the opinion of the treating physician, Dr. Lack; and (3) the ALJ improperly assessed Plaintiff's credibility.

### A.  Opinion of the Treating Psychological Therapist

Plaintiff first argues that the ALJ erroneously rejected the opinion of the treating psychological therapist, Rita Shirley, including her conclusions that Plaintiff was markedly limited in her ability to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to complete a normal workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 251-52.)  Specifically, Plaintiff contends that the ALJ rejected Ms. Shirley's opinion because he said that Ms. Shirley cited physical pain and not depressive symptoms as the reason for the limitations.

A review of the ALJ's decision shows that the ALJ did in fact consider Ms. Shirley's conclusions during his step three analysis of whether Plaintiff's mental conditions met or equaled the level of severity of an impairment specified in the Listing of Impairments. (20 C.F.R. Pt. 404, Subpt. P, App. 1).  The ALJ specifically refers to Ms. Shirley's report several times in his decision and apparently relied on her opinion when he concluded "it is possible that the claimant's mental condition may cause her to experience moderate restrictions in concentration, persistence, or pace."  (R. 24.)  The ALJ factored this limitation into Plaintiff's RFC when he stated that "[t]he claimant cannot be expected to perform at employment that requires more than simple, repetitive tasks."  (R. 24.)  Similarly, at the hearing the ALJ took into account that Plaintiff had "some disturbances with regard to attention and concentration" when he asked the VE to assume that the hypothetical individual was limited to "simple repetitive tasks."  (R. 301-02.)

15

In light of the ALJ's consideration and, in some cases, adoption of Ms. Shirley's findings, the Court cannot conclude that the ALJ erred by disregarding Ms. Shirley's opinion.

### B.  Opinion of the Treating Physician

Plaintiff also argues that the ALJ erroneously interpreted Dr. Lack's May 2003 Follow-Up Report.  (R. 244.)  Specifically, Plaintiff contends that the ALJ's mischaracterization of certain comments made in Dr. Lack's report provides a sufficient basis for the Court to reverse the ALJ's decision.  Alternatively, Plaintiff argues that the Court should reverse because the ALJ's misinterpretation of the May 2003 report effectively rejected Dr. Lack's May 2002 Multiple Impairments Questionnaire, and Dr. Lack's opinion as expressed in the questionnaire is entitled to controlling weight under SSA guidelines.  Ultimately, the Court finds the latter argument persuasive.  The ALJ did in fact mischaracterize Dr. Lack's statements and, by doing so, he effectively rejected Dr. Lack's opinions.

### 1.  The ALJ Mischaracterized Dr. Lack's 2002 and 2003 Reports

In his May 2003 report, Dr. Lack states the following:  "[Plaintiff] is significantly limited in her everyday activities.  She is capable of no more than sedentary activity and very light activity and must do this very sparingly with frequent rest.  Any increased activity aggravates her symptoms."  (R. 244.)  In his step three analysis, the ALJ interprets this statement as follows:

> The evidence also fails to establish that the claimant's musculoskeletal conditions meets [(*sic*)] or equals [(*sic*)] the severity of a listed impairment.  In that regard, the undersigned notes that Dr. Gaylin D. Lack, the claimant's treating physician since 1997, expressed the opinion in a May 13, 2003 missive that the claimant is capable of sedentary to very light activity.  The questionnaire completed by Dr. Lack on May 29, 2002, is consistent with his more recent opinion.  Therefore, the claimant's treating physician has opined that the claimant is capable of working, an opinion that does not suggest that a listing-level impairment exists.

(R. 24.)

Whether the ALJ misinterpreted or mischaracterized Dr. Lack's comments, it is fair to say that his conclusion contradicts Dr. Lack's opinion.  First, the ALJ takes Dr. Lack's statement

regarding Plaintiff's ability to perform "sedentary" and "light" activity as meaning that Plaintiff has an RFC of sedentary and light work. This interpretation runs contrary to the SSA's own guidelines, which stipulate that an ALJ "must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of the terms." SSR 96-5p. Furthermore, given the context of Dr. Lack's comments, it is clear that he is not using these terms in the manner the SSA defines them. Dr. Lack's reference to sedentary and light activities come directly after a sentence referring to Plaintiff's "everyday activities" rather than Plaintiff's ability to work. (R. 244) The ALJ thus clearly failed to consider the difference between a person's being able to engage everyday physical activities and a person's ability to work full time. See *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (criticizing an ALJ for "fail[ing] to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week.") Moreover, Dr. Lack's comments regarding sedentary and light activities conclude with a clause indicating that Plaintiff must engage in such activities "very sparingly with frequent rest." (R. 244.) Given the demands of virtually any full-time job, this clause contradicts the ALJ's statement that Dr. Lack "opined that the claimant is capable of working." (R. 24.)

In addition to misinterpreting Dr. Lack's May 2003 opinion, the ALJ misinterpreted or mischaracterized Dr. Lack's conclusions in his May 2002 Multiple Impairments Questionnaire. The ALJ states in his decision that "[t]he questionnaire completed by Dr. Lack on May 29, 2002, is consistent with his more recent opinion," and immediately follows this statement with the conclusion that "[Plaintiff's] treating physician has opined that the claimant is capable of working." (R. 24.) The combined effect of the two sentences is to give the impression that Dr. Lack's 2002 questionnaire indicates that Plaintiff is capable of work. However, Dr. Lack's 2002 decision plainly states, "the patient's prognosis for substantial improvement and *return to a functional status and gainful employment is very poor.*" (R. 213) (emphasis added). Thus, although Dr. Lack's 2002 questionnaire may be consistent with his 2003 opinion, neither one opines that Plaintiff is able to perform work.

Dr. Lack's conclusion that Plaintiff is unable to work does not establish that Plaintiff is disabled; such a determination is unequivocally the Commissioner's responsibility. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(e)(2). Nevertheless, the disparity between the very clear wording of Dr. Lack's 2002 and 2003 reports and the ALJ's contradictory interpretation of those reports indicates that the ALJ has effectively rejected Dr. Lack's opinions.

### 2. Dr. Lack's Opinions are Entitled to Controlling Weight

Dr. Lack's assertion that Plaintiff is incapable of work does not establish that Plaintiff is disabled for Social Security purposes. However, Plaintiff argues that certain other conclusions in the 2002 report are entitled to controlling weight. Federal regulations state that a treating source's opinion on the nature and severity of his patient's impairments controls when these opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and they are not inconsistent with the other substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2).

As an initial matter, the ALJ mentioned Dr. Lack's 2002 report only once in a brief, conclusory, and misleading sentence, as noted above. In that report, Dr. Lack opined that Plaintiff is limited to sitting for three to four hours in an eight hour day, to standing or walking for one to two hours in an eight hour day, and to occasionally lifting or carrying objects of up to ten pounds, and that she requires frequent and lengthy unscheduled breaks. (R. 215.) Here, Dr. Lack's opinions satisfy the requirements of the regulations and the ALJ should have given them controlling weight.

First, Dr. Lack is a treating source. 20 C.F.R. § 404.1502. He had an ongoing treatment relationship with Plaintiff beginning in 1997 and saw her numerous times between 1999, the year Plaintiff had her accident, and 2003. This extended, longitudinal record of treatment meets the policy concerns of the treating physician rule. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("[t]he advantage that a treating physician has over other physicians whose reports might figure in a disability case is that he has spent more time with the claimant").

18

Second, medically-acceptable clinical and laboratory techniques support Dr. Lack's opinions concerning Plaintiff's sit/stand/walk and exertional limitations.  20 C.F.R. § 404.1527(d)(2).  Here, Dr. Lack's opinions are supported by objective evidence including MRI imaging of spinal joint changes, cervical spine x-rays, and numerous physical examinations. (R. 213.)

Third, Dr. Lack's opinions are not inconsistent with other substantial evidence on the record.  None of the medical evidence on the record contradicts Dr. Lack's conclusions as to Plaintiff's limitation in lifting, standing, walking, and sitting.  Defendant argues that Dr. Atluri's 2001 report contradicts the limitations found by Dr. Lack's 2002 report, and thus Dr. Lack's prescribed limitations should not be given controlling weight.  Dr. Atluri's report states that Plaintiff has no difficulty with tandem walking, walking on her toes or heels, hopping on one leg, rising from a squat, or getting on and off the exam table (R. 174).  Defendant opines that these findings are inconsistent with Dr. Lack's limitations on Plaintiff's ability to stand and/or walk. However, the ability to do the activities cited by Dr. Atluri in no way contradicts Dr. Lack's findings.  For example, being able to walk on one's toes for a brief period of time during a medical examination has no bearing on whether one can be on one's feet in excess of four hours per day, five days a week in a competitive work environment.  Furthermore, certain findings in Dr. Atluri's report actually support Dr. Lack's 2002 report.  Dr. Atluri states that Plaintiff is unable to lift more than ten pounds, which is consistent with Dr. Lack's finding.  (R. 172, 215.) Dr. Atluri also states that Plaintiff is "[u]nable to walk ½ block distance" and that Plaintiff "tried to walk up and down the steps but it is very hard," findings that support Dr. Lack's limitations on Plaintiff's standing and walking.  (R. 172.)

Defendant also argues that Dr. Lack's conclusions are not controlling because they are inconsistent with the state agency physician's conclusions.  The state agency doctor's RFC (dated March 2001) indicates exertional and nonexertional limitations that are far less restrictive than those recommended by Dr. Lack; for example, the state agency RFC indicates that Plaintiff can occasionally lift twenty pounds, versus the ten pound limit urged by Dr. Lack, and the state agency RFC places no limitations on Plaintiff's ability to stand and/or walk.  (R. 177.)  However,

19

these conclusions were not drawn by an examining physician; rather, they were determined by an SSA doctor who relied on Dr. Atluri's 2001 examination of Plaintiff.  Moreover, the state agency doctor's conclusions are not supported by the conclusions drawn by Dr. Atluri.  The state agency doctor placed no limitation on Plaintiff's ability to walk, while Dr. Atluri states that Plaintiff is "[u]nable to walk ½ block distance."  (R. 177, 172.)  The state agency doctor indicated that Plaintiff was able to lift twenty pounds, while Dr. Atluri's report states that Plaintiff is unable to lift more than ten pounds.  (R. 177, 172.)  When the very medical evidence the state agency doctor relies on does not support his conclusions, such conclusions cannot be afforded weight.  *See* SSR 96-6p ("[T]the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record . . .").  Therefore, the state agency doctor's findings that contradict Dr. Lack's opinions do not constitute substantial evidence, and thus do not prevent Dr. Lack's medical assessments from being given controlling weight.

Defendant also argues that Dr. Lack's 2002 conclusions should not be controlling because they are inconsistent with Dr. Lack's own previous reports.  The Court has reviewed Dr. Lack's examination reports and finds that these reports are internally consistent regarding Plaintiff's ability to lift, stand, walk, and sit.  Dr. Lack's office notes describe physical conditions that correlate with these limitations.  For example, clinical findings from February and March 2001 indicate lower back pain and possible ruptured disks which would be consistent with the standing/walking limitations.  (R.131, 130.)  Similarly, a June 2000 report noted a correlation between physically strenuous work and increased symptoms.  (R. 138.)

Here, Dr. Lack was Plaintiff's treating physician, his findings were well-supported by clinical evidence, and his opinions regarding Plaintiff's ability to sit, stand, walk, and carry are not contradicted by substantial medical evidence.  Therefore, federal regulations provide that the ALJ must give Dr. Lack's opinion controlling weight.  20 C.F.R. § 404.1527(d)(2).

### 3. Dr. Lack's Medical Opinions Require Reversal of the ALJ's Decision

Under 42 U.S.C. § 405(g), the court has the authority to affirm, reverse, or modify a final decision of the Commissioner, with or without remand. 42 U.S.C. § 405(g), sentence 4. Remand for reconsideration by an ALJ is appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996). However, when all essential factual issues have been resolved and the record clearly establishes that the plaintiff is entitled to benefits, a judicial award of benefits is proper. *See, e.g., Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir. 1993).

Federal law "defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In the present case, substantial evidence in the record shows that Plaintiff cannot work: When the vocational expert was asked to consider the extent of Plaintiff's limitations as described by Dr. Lack, he testified that those limitations would prevent full-time work. The Court has already concluded that the ALJ should have given Dr. Lack's opinion regarding Plaintiff's limitations controlling weight. Therefore, the VE's uncontradicted testimony establishes that Plaintiff cannot work and mandates a finding that Plaintiff is disabled. A remand for further evidentiary proceedings would serve no purpose, and the Court concludes that reversal of the Commissioner's decision and entry of judgment for the claimant is appropriate. Therefore, the Court recommends remand for the purpose of computing an award of benefits.

### C. Credibility

Because the previous issue is dispositive, the Court need not consider the ALJ's credibility assessment.

## IV.  Summary

For the reasons set forth above, this Court recommends that Plaintiff's Motion for Summary Judgment **(#7)** be **GRANTED** and Defendant's Motion for an Order which Affirms the Commissioner's Decision **(#10)** be **DENIED**.  The ALJ's decision should be reversed and remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings consistent with this recommendation.  Remand pursuant to 42 U.S.C. § 405(g), sentence four, will terminate the case.  *Shalala v. Schaefer*, 509 U.S. 292, 299 (1993) (a sentence-four remand order terminates the case).

The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten (10) working days after being served with a copy of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 18th day of August, 2006.

s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE
